## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. _____ |
| v. | ) | |
| | ) | |
| WEATHERFORD SERVICES, LTD., | ) | **13 CR   734** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United

States of America, by and through Jeffrey H. Knox, Chief of the Fraud Section, Criminal

Division, United States Department of Justice, and Jason Linder, Trial Attorney, Fraud Section,

Criminal Division, United States Department of Justice (the "Department"), and the defendant

WEATHERFORD SERVICES, LTD. ("WSL" or the "defendant"), through its undersigned

attorneys, and through its authorized representative pursuant to authority granted by defendant's

Board of Directors, hereby submit this Plea Agreement ("Agreement"), the terms and conditions

of which are as follows:

### The Defendant's Agreement

1.       The defendant agrees to waive its right to indictment by a grand jury and further

agrees to plead guilty to the one-count Criminal Information (hereinafter "Information") in this

case, which charges the defendant with violations of the Foreign Corrupt Practices Act

("FCPA"), 15 U.S.C. § 78dd-3, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal

Procedure.  The defendant further agrees to persist with that plea through sentencing and, as set

forth below, to cooperate fully with the Department in its investigation into all matters related to the conduct charged in the Information.

2.     The defendant understands and agrees that this Agreement is between the Department and WSL.  This Agreement does not bind any other division or section of the Department of Justice, or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority.  The Department will bring this Agreement and the cooperation of the defendant, its direct or indirect affiliates, subsidiaries, and parent corporation, to the attention of other prosecuting authorities or other agencies, if requested by the defendant.

3.     The defendant agrees that this Agreement will be executed by an authorized corporate representative.  Defendant further agrees that a Resolution duly adopted by the defendant's Board of Directors, attached to this Agreement as Exhibit 1, represents that the signatures on this Agreement by WSL and its counsel are authorized by defendant's Board of Directors.

4.     The defendant agrees and represents that it has the full legal right, power, and authority to enter into and perform all obligations under this Agreement.

5.     The defendant agrees to pay to the United States a criminal fine in the amount of $420,000.  The defendant agrees to wire transfer $420,000.00 within ten (10) business days of sentencing to the Clerk of the Court for the United States District Court for the Southern District of Texas. The defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Texas the mandatory special assessment of $400 per count within five (5) business days from the date of sentencing.

6.     The defendant agrees that if it, its parent corporation, or any of its direct or indirect affiliates or subsidiaries, issues a press release or holds a press conference in connection

with this Agreement, the defendant shall first consult with the Department to determine whether (a) the text of the release or proposed statements at any press conference are true and accurate with respect to matters between the Department and the defendant; and (b) the Department has an objection to the release or statement. Nothing in this Paragraph restricts the defendant, its parent corporation, or any of its direct or indirect affiliates or subsidiaries, from fulfilling obligations under the federal securities laws or from interacting with investors.

7.      The defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

      a.      To plead guilty as set forth in this Agreement;

      b.      To abide by all sentencing stipulations contained in this Agreement;

      c.      To: (i) appear, through duly appointed representatives, as ordered for all Court appearances; and (ii) obey any other ongoing Court order in this matter;

      d.      To commit no further crimes;

      e.      To be truthful at all times with the Court; and

      f.      To pay the applicable fine and special assessment.

8.      The defendant agrees to cooperate fully with the Department as directed, and with any other federal, state, local, or foreign law enforcement agency as directed by the Department. This cooperation requires that the defendant:

      a.      Truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine protection with respect to its activities and those of its present and former directors, officers, employees, agents, consultants, contractors, and subcontractors, concerning all matters relating to corrupt payments and related internal

accounting controls or books and records violations about which the defendant has any knowledge;

        b.      Provide any non-privileged document, record, or other tangible evidence relating to such payments and related internal accounting controls or books and records violations if requested to do so; and

        c.      Ensure that the Department is given access to all current and, to the extent possible, former WSL directors, officers, employees, agents, and consultants for interviews and testimony in the United States relating to such payments and related internal accounting controls or books and records violations.

9.      The defendant agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, the defendant shall include in any contract for sale, merger, or transfer a provision fully binding the purchaser(s) or any successor(s) in interest thereto to the obligations in this Agreement.

**The United States' Agreement**

10.     In exchange for the corporate guilty plea of the defendant and the complete fulfillment of all of its obligations under this Agreement, and in exchange for the agreement of the defendant's parent corporation, Weatherford International Ltd., to assume all of the obligations set forth in a deferred prosecution agreement in a parallel matter, the Department agrees that it will not file additional criminal charges against the defendant or any of its direct or indirect affiliates or subsidiaries, or its parent corporation, relating to:

        a.      the conduct described in the Statement of Facts attached as Exhibit 2; or

b.      information disclosed by the defendant or its parent corporation, Weatherford International Ltd., to the Department prior to the date of this Agreement.

11.      This Agreement does not provide any protection against prosecution for any corrupt payments, false accounting, or internal accounting controls violations in the future by the defendant, or by any of its officers, directors, employees, agents, or consultants, whether or not disclosed by the defendant pursuant to the terms of this Agreement.  This Agreement also does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the defendant, who may have been involved in any of the matters set forth in the Information, Statement of Facts, or in any other matters.

## Factual Basis

12.      The defendant is pleading guilty because it is guilty of the charges contained in the sole count of the Information.  The defendant agrees and stipulates that the factual allegations set forth in the Information are true and correct and accurately reflect the defendant's criminal conduct.  The parties further stipulate and agree to the Statement of Facts attached hereto and incorporated herein as Exhibit 2.

## Defendant's Waiver of Rights, Including the Right to Trial and Appeal

13.      The defendant represents to the Court that defendant is satisfied that the defendant's attorneys have rendered effective assistance.  Defendant understands that by entering into this Agreement, the defendant surrenders certain rights as provided in this Agreement. Defendant understands that the rights of defendants include the following:

a.      If the defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be

conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

b.      At a trial, the United States would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to confront those witnesses and the defendant's attorney would be able to cross-examine them.  In turn, the defendant could, but would not be required to, present witnesses and other evidence on its own behalf.  If the witnesses for the defendant would not appear voluntarily, the defendant could require their attendance through the subpoena power of the Court.

c.      At a trial, no inference of guilt could be drawn from the defendant's refusal to present evidence.  However, if the defendant desired to do so, it could present evidence on its behalf.

14.     The defendant understands that nothing in this Agreement will restrict access by the United States Probation Office or the Court to information and records in the possession of the United States or any of its investigative law enforcement agencies, including state and local law enforcement agencies, as well as information, documents and records obtained from the defendant.

15.     The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.  Should the Court impose the sentence proposed herein, the defendant agrees that it will waive the right to appeal the plea, conviction, and sentence (or the manner in which it was determined) on the grounds set forth in Title 18, United States Code, Section 3742.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).

16.     The defendant is also aware that the United States Constitution and the laws of the United States afford the defendant the right to contest or "collaterally attack" its conviction or sentence after the conviction has become final.  Knowing that, the defendant knowingly waives the right to contest or "collaterally attack" the defendant's plea, conviction, and sentence by means of any post-conviction proceeding.

17.     The defendant waives all defenses based on the statute of limitations with respect to any prosecution relating to the conduct described in the attached Statement of Facts that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the defendant violates this Agreement; or (c) the plea is later withdrawn, provided that such prosecution is brought within one year of any such vacation of conviction, violation of the agreement, or withdrawal of the plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed.  The Department is free to take any position on appeal or any other post-judgment matter.

18.     Defendant waives all defenses to the conduct charged in the Information based on venue, speedy trial under the United States Constitution and Speedy Trial Act, and any and all constitutional and non-jurisdictional defects.

### Penalty

19.     The statutory maximum sentence that the Court can impose for a violation of Title 15, United States Code, Section 78dd-3, is a fine of $2,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest, 15 U.S.C. § 78dd-3(e)(1)(A), 18 U.S.C. § 3571(d); five years' probation, 18 U.S.C. § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).

a.     The defendant hereby stipulates and agrees not to institute or participate in any proceeding to interfere with, alter, or bar enforcement of any fine, penalty, special assessment, or forfeiture order pursuant to the automatic stay or other provision of the United States Bankruptcy Code.

b.     The defendant agrees that nothing in this Agreement is intended to release the defendant from any and all of the defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

**Sentencing Factors**

20.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in 18 U.S.C. § 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.

21.     The Department and the defendant agree that a faithful application of the United States Sentencing Guidelines (USSG) to determine the applicable fine range yields the following analysis:

a.     The 2012 USSG Manual sets forth the appropriate guidelines to be used in this matter.

b.     Offense Level: Based upon USSG §2C1.1, the total offense level is 18, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 12 |
| (b)(1) | Multiple Bribes | + 2 |

        (b)(3)  High-Level Recipient                      + 4

        TOTAL                                           18

c.    <u>Base Fine</u>: Based upon USSG §8C2.4(d), the base fine is $350,000, based on a total offense level of 18 under USSG §2C1.1.

d.    <u>Culpability Score</u>: Based upon USSG § 8C2.5, the culpability score is 6, summarized as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(3)(A) | The organization had 200 or more employees and individuals within high-level personnel participated in, condoned, or were willfully ignorant of the offense | 3 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 6 |

e.    Calculation of Fine Range: Based upon USSG § 8C2.7, the fine range is calculated as follows:

| | |
|---|---|
| Base Fine | $350,000 |
| Multipliers | 1.2/2.4 |
| Fine Range | $420,000/$840,000 |

### Sentencing Recommendation

22.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Department and the defendant agree that the following represents the appropriate disposition of the case:

      a.    <u>Fine</u>.  The parties agree that the imposition of a fine in the amount of $420,000 is appropriate in this case.

b.      Organizational Probation.  The parties agree that a term of organizational probation is not appropriate in this case, as the defendant's parent corporation, Weatherford International Ltd., has separately agreed to the retention of an independent corporate monitor, pursuant to the deferred prosecution agreement referenced in Paragraph 10.

c.      Mandatory Special Assessment.  The defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Texas within (5) business days of the time of sentencing the mandatory special assessment of $400 per count.

d.      Court Not Bound.  This agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the defendant's counsel that the Court is not required to follow the Agreement and afford the defendant the opportunity to withdraw its plea; and (c) advise the defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the Agreement contemplated.  The defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.  The defendant, however, also understands that if the Court accepts this Agreement, the Court is bound by the sentencing recommendations in paragraph 22.

**Consolidation of Plea and Sentencing and Waiver of Presentence Investigation**

23.      The parties agree, subject to the Court's approval, to waive the requirement for a presentence report, pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing power.  The parties, however, agree that in the event the Court orders the preparation of a presentence report prior to sentencing, such order will not affect

the agreement set forth herein.  Additionally, if the Court directs the preparation of a presentence report, the Department will fully inform the preparer of the presentence report and the Court of the facts and law related to the defendant's case.

24.     The parties further agree to request that the Court combine the entry of the guilty plea and sentencing into one proceeding.  The parties, however, agree that in the event the Court orders that the entry of the guilty plea and sentencing hearing occur at separate proceedings, such an order will not affect the Agreement set forth herein.

### Breach of the Plea Agreement

25.     If the defendant breaches the terms of this Agreement, or commits any new criminal offense between signing this Agreement and sentencing, the Department is relieved of its obligations under this Agreement, but the defendant may not withdraw its guilty plea. Whether the defendant has breached any provision of this Agreement shall be determined solely by the Department.

26.     In the event of a breach of this Agreement by the defendant:

a.     WSL shall be fully subject to criminal prosecution for any crimes, including perjury and obstruction of justice;

b.     the Department will be free to use against WSL, directly and indirectly, in any criminal or civil proceeding any of the information or materials provided by WSL pursuant to this Agreement, as well as the admitted Statement of Facts contained herein; and

c.     should the Department elect to pursue criminal charges or any civil action that was not filed as a result of this Agreement, then WSL agrees that any applicable statute of limitations is tolled between the date of WSL's signing of this Agreement and the discovery by the Department of any breach by WSL, and WSL waives all defenses based on the statute of

limitations, venue, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.

### Complete Agreement

27.     This written Agreement constitutes the complete plea agreement between the parties.  No promises or representations have been made by the United States except as set forth in writing in this Agreement.  The defendant acknowledges that no threats have been made against the defendant and that the defendant is pleading guilty freely and voluntarily because the

defendant is guilty. Any modification of this Agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

FOR WSL:

Date: _11/25/13_                 By: _____

F. Joseph Warin
Michael J. Edney
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500

Date: _NOVEMBER 25, 2013_         By: _____

Alejandro Cestero
Vice President, Co-General Counsel and Corporate Secretary
Weatherford International Ltd., on behalf of Weatherford Services, Ltd.

FOR THE DEPARTMENT:            JEFFREY H. KNOX
                              CHIEF, FRAUD SECTION
                              CRIMINAL DIVISION
                              U.S. DEPARTMENT OF JUSTICE

Date: _11/25/13_                 By: _____

Jason Linder
California Bar No. 212665
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 514-3740
Fax: (202) 514-6118

13

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for Weatherford Services, Ltd. ("WSL"). I understand the terms of this Agreement and voluntarily agree, on behalf of WSL, to each of its terms. Before signing this Agreement on behalf of WSL, I consulted with counsel for WSL. Counsel fully advised me of the rights of WSL, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed this Agreement with the Board of Directors of WSL. I have advised, and caused outside counsel for WSL to advise, the Board fully of the rights of WSL, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of WSL and Weatherford International Ltd., in any way to enter into this Agreement. I am also satisfied with counsel's representation in this matter.

I certify that I am an officer of Weatherford International Ltd., the parent corporation of WSL, and that I have been duly authorized by WSL to execute this Agreement on behalf of WSL.

Date: November 22, 2013

WEATHERFORD SERVICES, LTD.

By: _____

Alejandro Céstero
Vice President, Co-General Counsel and Corporate Secretary
Weatherford International Ltd., on behalf of
Weatherford Services, Ltd.

## CERTIFICATE OF COUNSEL

We are counsel for Weatherford Services, Ltd. ("WSL") in the matter covered by this Agreement. In connection with such representation, we have examined relevant WSL documents and have discussed this Agreement with the Board of Directors of WSL and authorized representatives of WSL. Based on our review of the foregoing materials and discussions, we are of the opinion that WSL's representatives have been duly authorized to enter into this Agreement on behalf of WSL. This Agreement has been duly and validly authorized, executed, and delivered on behalf of WSL and is a valid and binding obligation of WSL. Further, we have carefully reviewed every part of this Agreement with the Board of Directors of WSL. We have fully advised them of WSL's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To our knowledge, WSL's decision to enter into this Agreement is an informed and voluntary one.

Date: __11/25/13__

F. Joseph Warin
Michael J. Edney
GIBSON, DUNN, & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500

**EXHIBIT 1**

## CERTIFICATE OF CORPORATE RESOLUTIONS

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

## WEATHERFORD SERVICES, LTD.
## CERTIFICATE OF CORPORATE RESOLUTIONS

I, Alejandro Cestero, do hereby certify that I am the Vice President, Co-General Counsel and Corporate Secretary of Weatherford Services, Ltd. (the "Company"), a wholly owned subsidiary of Weatherford International Ltd. incorporated in Bermuda, and that the following is an accurate excerpt of certain resolutions adopted by the Board of Directors of Weatherford Services, Ltd. (the "Board") by unanimous written consent dated November 18, 2013:

**WHEREAS**, the Board has been informed by its counsel of a proposed settlement with the United States Department of Justice ("DOJ") in relation to certain matters which have been under investigation by DOJ (the "Proposed Settlement"), and the key terms of the Proposed Settlement have been distributed to the members of the Board as Annex 1 hereto;

**WHEREAS**, the Proposed Settlement contemplates:

(1)     The Company pleading guilty to certain crimes pursuant to a plea agreement with the DOJ (the "Plea Agreement"),

(2)     the government and the Company agreeing to recommend to the court a fine of $420,000 as appropriate under the circumstances;

(3)     the court retaining under the law the final determination of the fine to be imposed;

(4)     imposition of commitments set out in the Plea Agreement on the Company; and

(5)     the Company agreeing to include in any sale or merger agreement the requirement that the successor or purchaser company abide by the commitments set out in item 4 above.

**NOW, THEREFORE,** the Board has resolved as follows:

**RESOLVED**, that the key terms of the Proposed Settlement that have been distributed to the members of the Board as Annex 1 hereto are hereby approved and the Proposed Settlement is hereby agreed to in principle by the Company;

**FURTHER RESOLVED**, that Alejandro Cestero, Vice President, Co-General Counsel and Corporate Secretary of the Company's parent corporation, Weatherford International Ltd., is authorized and directed to execute and deliver the Plea Agreement on behalf of the Company and such other documents as are necessary to effect the Proposed Settlement, and to take such other and further actions as may be approved by the Board of Directors of the Company or any authorized committee or subcommittee thereof, as applicable, to consummate the

Proposed Settlement and the resolution of the investigation of past payments and practices referenced above, including appearing before the United States District Court for the Southern District of Texas, Houston Division, to enter a plea of guilty on behalf of the Company and accept the sentence of the Court.

I further certify that the aforesaid resolutions have not been amended or revoked in any respect and remain in full force and effect on the date of this certification.

**IN WITNESS WHEREOF**, I have executed this Certificate on November 23, 2013.

Alejandro Cestero
Weatherford Services, Ltd.
Secretary

Signed before me this _25_ day of _November_ 2013.

Notary Public in and for the State of Texas

KATHLEEN A. MARINO
Notary Public, State of Texas
My Commission Expires
March 07, 2016

2

**EXHIBIT 2**

**STATEMENT OF FACTS**

1.    The following Statement of Facts in incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section (the "Department") and WEATHERFORD SERVICES, LTD. ("WSL"), and the parties agree and stipulate that the following information is true and accurate.  Had this matter proceeded to trial, the Department would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information.  This evidence would establish the following:

2.    Weatherford International Ltd. ("Weatherford") was a multinational corporation that provided equipment and services to the oil industry.  Weatherford employed more than 50,000 employees and operated in more than 100 countries.  Prior to March 2009, Weatherford was incorporated in Bermuda and headquartered in Houston, Texas, in the Southern District of Texas.  As of March 2009, Weatherford was incorporated and headquartered in Switzerland, although it maintained a significant presence in Houston, Texas.  Weatherford was a complex organization, comprising more than 500 legal entities.  From at least in or around 1998 until the filing of this Information, Weatherford issued and maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, Weatherford was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.  Weatherford's shares traded on the New York Stock Exchange under the symbol "WFT."

3.     The defendant, WEATHERFORD SERVICES, LTD. ("WSL"), was a wholly owned subsidiary of Weatherford incorporated in Bermuda.  Among other functional responsibilities, WSL managed most of Weatherford's activities in Angola.  WSL had between 886 employees (in 2005) and 1,298 employees (in 2007).  WSL, a non-issuer foreign corporation, was a "person," as that term is used in the FCPA, 15 U.S.C. § 78dd-3(f)(1).  WSL was also subject to Weatherford's internal accounting controls, and WSL's financial results were included in the consolidated financial statements that Weatherford filed with the SEC.

4.     "Weatherford Executive A," a citizen of the United States, held various positions relating to Weatherford's well screens business from in or around September 2004 until February 2013, including as Vice President of Completions and Production Systems.

5.     "Weatherford Legal Counsel A," a citizen of the United States, was a Senior Corporate Counsel at Weatherford from in or around October 2004 until in or around June 2008.

6.     "WSL Manager A," was WSL's Area Manager for the West Africa South Area from in or around March 2004 until in or around March 2005.

### *Relevant Entities and Foreign Officials in Angola*

7.     Sociedade Nacional de Combustíveis de Angola, E.P. ("Sonangol") was a government-owned and -controlled corporation established in 1976 by decree 52/76 of the Angolan government and headquartered in Luanda, Angola. Sonangol was the sole concessionaire for exploration of oil and gas in Angola, and was solely responsible for the exploration, production, manufacturing, transportation, and marketing of hydrocarbons in Angola.   Sonangol was run by a board of directors established by governmental decree in 1999. Each member of the board was also appointed or renewed in their position by governmental decree.  Because Sonangol was wholly owned, controlled, and managed by the Angolan

government, it was an "agency" and "instrumentality" of a foreign government and its employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2).

8.     "Angolan Official 1," "Angolan Official 2," and "Angolan Official 3" were high-level, senior officials of Sonangol, and they had influence over contracts.

9.     "Angolan Official 4" was a high-level, senior official of Angola's Ministry of Petroleum, and he had influence over contracts entered into by the Angolan government.

10.     "Angolan Official 5" was a Sonangol official with decision making authority in Angola's Cabinda region.

11.     The "Freight Forwarding Agent," a Swiss company, was a provider of freight forwarding and logistics services in, among other places, Angola.

### Conduct in Angola

12.     From in and around 2004 through at least 2008, WSL engaged in two schemes to bribe Sonangol officials to obtain or retain business.

### The Angolan Joint Venture

13.     One of those bribery schemes centered around a joint venture which WSL and other Weatherford employees established with two local Angolan entities.  Angolan Officials 1, 2, and 3 controlled and represented one of the entities; a relative of Angolan Official 4 controlled and represented the other.

14.     The joint venture began because WSL sought a way to increase its share of the well screens market in Angola.  When placed in oil wells, well screens filter out sand, gravel, and other impurities while allowing oil to flow through piping.  In 2004, WSL learned that Sonangol was encouraging oil services companies to establish a well screens manufacturing

operations in Angola with a local partner. Sonangol officials suggested that the major well screens supplier that established such a local manufacturing operation would control one hundred percent (100%) of the well screen market in Angola.

15.     In a June 29, 2004, email, Weatherford Executive A noted that, "[i]n recent meetings with Sonangol, they made it very clear that whichever of the major suppliers establishes a local operation will dominate the Angolan market [for well screens] and Sonangol will block entry of additional competition. . . . If someone can pull it off affectively [sic], they would control an $8 – 10M/year market."

16.     On July 12, 2004, a high-level Weatherford executive sent Angolan Official 1 a letter expressing Weatherford's intent to form a well screens manufacturing operation in Angola with a local partner and requesting Sonangol's participation in the process.

17.     In a July 22, 2004, email, Angolan Official 1 advised WSL that Sonangol had selected local partners for WSL and that Sonangol would support the joint venture.

18.     In September 2004, the parties agreed that two local Angolan entities (Angolan Company A" and "Angolan Company B") would be WSL's joint venture partners.  Angolan Officials 1, 2, and 3 conducted all business with WSL on behalf of Angolan Company A. Angolan Company B was owned in part by the daughter of Angolan Official 4.

19.     Certain WSL and Weatherford employees knew from the outset of discussions regarding the joint venture that the members of Angolan Company A included a Sonangol employee and Angolan Official 3's wife, while Angolan Company B's members included Angolan Official 4's daughter and son-in-law.  In an October 21, 2004, email, Weatherford Executive A advised Weatherford Executive B that, "[t]here will be two parties involved [in the joint venture], Sonangol through an entity named [Angolan Company A] and a private individual

(the daughter of [Angolan Official 4]) through an entity named [Angolan Company B]."
Weatherford Executive B replied, "[u]h oh. I am going to have to get scrutiny with our D.C.
trade lawyers since an individual related to the govt entity is involved . . . ." Weatherford
Executive A replied, "I hope you are just being cautious and this isn't a deal killer."

20.     In October 2004, Angolan Officials 1, 2, and 3 came to Weatherford's
headquarters in Houston, Texas, in the Southern District of Texas, to negotiate the terms of the
joint venture with employees of WSL and Weatherford. They were not accompanied by the
nominal members of either Angolan Company A or Angolan Company B. On October 27, 2004,
Angolan Official 2 and Weatherford Executive A signed a letter of intent between "Sonangol and
or the designees" and Weatherford, which provided that Sonangol would negotiate exclusively
with WSL and Weatherford for a well screens joint venture in Angola.

21.     By mid-2005, the joint venture had not yet been established. In a May 17, 2005,
email exchange, Weatherford executives discussed Angolan Officials 1, 2, and 3's displeasure
with the slow pace of negotiations regarding the joint venture. Weatherford Executive A
observed that, "[o]ur friends advised us they did their part and cancelled the $10M Kizomba
contract and moved it over to us and it wouldn't be too much trouble to cancel it again and re-
award it to [the competitor who originally had it]."

22.     On July 8, 2005, Weatherford Executive A and Weatherford Legal Counsel A met
with Angolan Officials 1 and 3, as well as the daughter of Angolan Official 4, in London,
England, to negotiate the terms of the joint venture. As with the October 2004 meeting in
Houston, the nominal members of Angolan Company A and Angolan Company B did not
accompany the Angolan officials.

23.     That same day, Weatherford Legal Counsel A emailed a high-level Weatherford executive to report that the joint venture, "will lock up 100% of screen business in Angola."

24.     Prior to entering into the joint venture, neither Weatherford nor WSL conducted any meaningful due diligence of either joint venture partner.

25.     In October 2004, Weatherford Legal Counsel A had contacted a law firm to discuss whether partnering with the Angolan companies raised issues under the FCPA. An attorney at that law firm sent Weatherford Legal Counsel A an email on October 22, 2004, advising that Weatherford needed to learn the identity of the true beneficiaries of Angolan Company A and that Weatherford may need a "potential recusal" from Angolan Company B. Despite the outside lawyer's attempts to follow-up, Weatherford Legal Counsel A never responded to that attorney again and did not follow the advice he had provided.

26.     In a July 18, 2005, email, a different law firm, which was involved in the joint venture negotiations on WSL's and Weatherford's behalf, advised Weatherford Legal Counsel A to "[p]lease check the convenience of this Section [the FCPA clause in the joint venture agreement] since we suspect that the partners of [Angolan Company A] and [Angolan Company B] have close relationship or are employees of a State owned company in Angola." In response, Weatherford Legal Counsel A falsely told the outside counsel that the joint venture had been vetted and approved by other outside counsel, when, in fact, no outside law firm ever conducted such vetting or gave such approval.

27.     On September 21, 2005, WSL signed the final joint venture agreement with Angolan Company A and Angolan Company B. Under the terms of the agreement, another Angolan-based Weatherford entity and Angolan Company A each owned forty-five percent (45%) of the joint venture, while Angolan Company B owned the remaining ten percent (10%).

Neither Angolan Company A nor Angolan Company B provided any personnel or expertise to the joint venture. Nor did they make any capital contribution. Instead, on May 3, 2007, WSL and Weatherford paid capital contributions to the joint venture on behalf of both local companies, in the amount of $25,000 each.

28.     In April 2006, approximately seven months after the joint venture agreement had been executed, Weatherford Legal Counsel A emailed another law firm seeking advice about "any potential problems under the FCPA" regarding the joint venture. The law firm responded with a number of questions about, *inter alia*, why the joint venture partners were selected, what due diligence WSL and Weatherford had conducted on the joint venture partners, and whether the individuals involved in the joint venture could influence the award of work to the joint venture. Weatherford Legal Counsel A never responded to these questions. Current counsel for Weatherford and WSL is not any of the law firms discussed in this Information.

29.     No nominal member of Angolan Company A had any involvement in the negotiation of the joint venture agreement or in the operation of the joint venture. Angolan Official 1 primarily handled negotiations on Angolan Company A's behalf, as well as operational decisions once the joint venture began to function. Angolan Official 4's daughter primarily gave operational input on behalf of Angolan Company B.

30.     In a January 2006 email to Weatherford Executive A, on which Angolan Official 3 and the daughter of Angolan Official 4 were copied, Angolan Official 1 noted that "The Local partners ([Angolan Company A] and [Angolan Company B]) are not getting any financial benefits, even if you already received contracts without any bid . . . . SONANGOL EP is analyzing the possibility of not giving any new contract to Weatherford, until that situation is changed."

31.    In an August 1, 2006, email, Weatherford Executive A discussed the need to meet the "named partners" to finalize registration documents relating to the joint venture, but that "[s]eparate from that, [another Weatherford executive] would like to meet with the 'real' partners – [Angolan Officials 1, 2, and 3]."

32.    In September 2006, several WSL and Weatherford employees, including high-level executives, met with Angolan Officials 1 and 3, and the daughter of Angolan Official 4, in Paris. WSL arranged and paid for all attendees' travel and hotel accommodations. At that meeting, WSL and Weatherford executives and employees and the Angolan officials discussed the contemplated terms of the joint venture.

33.    In 2008, Angolan Company A and Angolan Company B received joint venture dividends for 2005 and 2006, including on revenues received in 2005 before the September 21, 2005, execution of the joint venture agreement. The dividends included payment of the withholding tax Angolan Company A and Angolan Company B owed for those two years. In total, the joint venture paid Angolan Company A $689,995.54, and paid Angolan Company B $136,901.92. The joint venture did not pay dividends for any other years.

34.    Prior to the distribution of joint venture dividends, WSL executives knew that Angolan officials were directing the distribution of those dividends. For example, in a September 19, 2007, email, Angolan Official 1 provided a WSL executive with Angolan Company A's bank account details.

35.    WSL benefited from the joint venture arrangement. As early as December 7, 2004, before the joint venture had even been finalized, Sonangol began taking well screens business away from WSL's competitors, even when a competitor was supplying non-governmental companies, and awarding it to WSL.

8

36.     Once the joint venture was in place, WSL received additional improper benefits from Angolan Officials 1, 2, and 3.  For example, WSL received awards of business for which its bids were, by its own admission, not price-competitive.  In a January 25, 2006, email, for example, a WSL executive advised a Weatherford executive that a valuable well screens contract had been awarded to WSL in spite of being priced 30% higher than the competition, stating that "[o]ur connections in Sonangol have again help[ed] us to secure the contract."

37.     On November 9, 2006, a WSL executive emailed Sonangol Official 2 after learning that Sonangol had approved a competitor receiving a well screen contract from a private oil company.  The WSL executive asked that Sonangol Official 2 "intervene as soon as possible" and added, "I do not know exactly what happened during the tender process and we hope this is just a miss communication [sic] between the departments in Sonangol, but ha [sic] have to make sure during our next meeting the end of November to establish a procedure for all screen related tenders."  The WSL executive directed Sonangol Official 2 to "check with [Sonangol Official 3 and another Sonangol official] in which way we can get the order for [the joint venture] and cancel the contract with [the competitor]."

38.     Sonangol then directed that the contract be taken away from the competitor and given to the joint venture.  On November 29, 2006, Weatherford Executive A emailed Legal Counsel A that "I sat in a meeting this morning with ourselves, [the competitor], and [the counterparty to the contract] as they told [the competitor] that they were cancelling the $7M Block 4 contract they had received and awarding it to us.  I then told [the counterparty] that we would need another 10-15% to cover our local activities and they didn't flinch.  Every now and then, life gets good."

39.     In a January 19, 2007, email, a WSL executive told a Weatherford executive that he would "get the actual prices [for a bid] from our competition next week from Sonangol." The Weatherford executive responded that such "info should not be distributed via e-mail."

### The Cabinda Region Contract Renewal

40.     In the second bribery scheme in Angola, WSL bribed Angolan Official 5 so that he would approve the renewal of a contract under which WSL provided oil services to a non-governmental oil company in the Cabinda region of Angola. WSL had initially won that five-year contract in 1998, and the parties had extended the contract in yearly increments between 2003 and 2005, with the final one expiring October 31, 2006.

41.     The contract was between WSL and another non-governmental company. Angolan law required, however, that it be approved by Sonangol before being finalized. Angolan Official 5 was the Sonangol official responsible for approving or denying the renewal contract.

42.     During the contract renewal bid process, WSL Manager A met with Angolan Official 5 in late 2005. At that meeting, Angolan Official 5 slid an envelope across the table with a slip of paper inside. The paper had "250,000" written on it. WSL Manager A understood this to be a solicitation for a bribe, and he refused to pay it. Indeed, in his 2006 end-of-year ethics questionnaire response, WSL Manger A indicated that he believed that other WSL and Weatherford personnel had been making illegal payments to government officials in Angola and elsewhere.

43.     In 2006, after WSL Manager A had been transferred out of Angola, WSL executives agreed to pay the bribe Angolan Official 5 had demanded. In exchange for these payments, WSL received the renewal contract to provide oil services in Angola's Cabinda

region.

44.     WSL made those payments to Angolan Official 5 through the Freight Forwarding Agent, who had previously paid bribes on behalf of WSL.  WSL retained the Freight Forwarding Agent via a consultancy agreement fully executed on July 5, 2006.  In the original draft of the consultancy contract, WSL and Weatherford had included an FCPA clause prohibiting the Freight Forwarding Agent from giving anything of value, directly or indirectly, to an official or employee of any government.  The owner of the Freight Forwarding Agent rejected the clause, stating that "in view of the nature of the business I cannot accept the original wording."  WSL and Weatherford acquiesced by removing the FCPA clause and inserting a clause requiring the Freight Forwarding Agent to "comply with all applicable laws, rules, and regulations issued by any governmental entity in the countries of business involved."

45.     WSL generated sham purchase orders for consulting services the Freight Forwarding Agent never performed, and the Freight Forwarding Agent, in turn, generated sham invoices for those same nonexistent services.  When paid for those invoices, the Freight Forwarding Agent passed some of those monies on to Angolan Official 5.  The monies were given to Angolan Official 5 either in cash or by wire transfer into an account controlled by one of his employees.